**Donnie Paul BOOTH, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 12–86–0048–CR.

Court of Appeals of Texas,
Tyler.

Feb. 27, 1987.

Rehearing Denied March 26, 1987.

Terry D. Bailey, Bailey & Bailey, Carthage, for appellant.

John Walker, Dist. Atty., Center, for appellee.

COLLEY, Justice.

Donnie Paul Booth (Booth), on the advice of his court-appointed lawyer, pleaded guilty before a jury to an indictment charging him with murder.[1] The jury assessed punishment at ninety-nine years. Booth argues two points of error, claiming he was denied effective assistance of counsel at the punishment stage of the trial, and that his plea of guilty was not knowingly and voluntarily made because of his counsel's constitutionally deficient performance. We reverse the judgment and remand the cause for a new trial.

The record of the punishment trial reveals the following facts. Booth shot and killed his grandfather, Mike Booth, on September 14, 1985. On that day, the defendant, who was unemployed, had traveled from Longview to the residence of his paternal uncle. The uncle and grandfather lived together in a mobile home located near Tatum in a rural area of Panola County. Booth, who was in desperate financial straits, planned to borrow money from his uncle. When Booth arrived at the mobile home, his uncle was absent but his grandfather was present. According to Booth's testimony, he arrived at the mobile home at about 2:30 p.m. He related that his grandfather "was sitting on the front porch and I kinda set [sic] down and ask[ed] if [the uncle] was there and he said no.... I told him that I needed to talk to [the uncle] and that is when he started in on me." Booth then testified that an argument between him and his grandfather ensued. He testified that his grandfather called his mother a bitch several times, and testified that his grandfather had verbally abused his mother for about two years previous to that day. He testified that following this argument he was "just mad." On cross-examination Booth explained that at the time of the shooting, "I was so mad.... The last

1. Under Texas Penal Code Annotated § 19.-02(a)(1) (Vernon 1974). All references to sections in this opinion are to the 1974 Texas Penal Code unless otherwise noted.

thing I remember was seeing a gun laying on the bed and the next thing I know I had it in my hand." According to Booth's testimony, he had drunk six or seven beers and had taken two quaalude pills before he arrived at the grandfather's place of residence. He further testified as follows:

A  Well, I could see that we were fixing to get into a bad argument. Like I said, I had been staying there on and off awhile and I knew what it was going to lead to. I could feel myself getting mad and I was already drunk and I had taken some pills.

. . . .

Q  What were you arguing about?

A  He just kept on saying that Aunt Ruby don't want you down here. You know that Ruby Ellis don't want you here. I told him that I didn't come here to talk to Ruby Ellis. I said I came to talk to Uncle Charles and I said that he pays as much rent as you do here and I said that I do not have any intentions of leaving until I get to see him. Besides, I couldn't leave. I didn't have any gas left in the car, so I went outside and I got to the back again and I drank the other beer and I came back and sat down and the last thing that I can remember him saying was that he called her a bitch again. He said you and your bitching mother havn't [sic] ever done anything and you don't deserve any money from us. I told him, I said, I don't want your money and he called her a bitch again and said she always had been. I got up. I could remember getting up and I walked in the house. I could remember seeing the gun on the bed. The next thing I know was that I was standing with the gun in my hand and the screen was tore off the window and I snapped, but I did it.

Q  Do you remember firing the gun?

A  No, but I did.

After the verdict of the jury was received by the court on February 25, 1986, the jury was discharged, whereupon the court pronounced judgment against Booth on the verdict. The court then advised Booth of his right to appeal and stated that if he did wish to appeal, counsel would be appointed. The judge indicated that he would appoint trial counsel as appellate counsel. The court then recessed the proceeding until the following day. On February 26, 1986, Booth's trial counsel advised the court that Booth wished to file a motion for new trial, and desired different counsel. Trial counsel was removed and ultimately the Honorable Terry D. Bailey (Bailey) was appointed to represent Booth in his motion for new trial as well as in this appeal. The hearing on Booth's motion for new trial also produced testimony and evidence upon which this court relies in ruling on Booth's points of error. Booth and his appointed trial counsel both testified on the motion for new trial of the continuing colloquy between them preceding and during the trial. Trial counsel testified that he first consulted Booth about four or five days following his appointment as Booth's trial counsel. He summarized his pretrial investigations, interviews, and other pretrial matters relating to discovery. From the record it appears that trial counsel employed medical experts[2] to test Booth regarding his sanity at the time of the offense and competency to stand trial. The written reports of both experts were introduced into evidence at the hearing on the motion for new trial. Dr. Langston who had treated Booth since 1979 merely states in his report that Booth has a personality disorder, but he has "never shown evidence of a psychosis other than as related to his mixed substance abuse." Dr. Sanders' report states that Booth was examined by Sanders on January 8, 1986, and recited that Booth "knows right from wrong" and is competent to stand trial, but that Booth has an "anti-social personality." The testimony of trial counsel makes it clear that he was informed before trial, that shortly be-

2.  Wm. B. Langston, Jr., M.D., a psychiatrist, and Wm. R. Sanders, M.D. of the Sabine Valley Regional MHMR Center.

fore the fatal shooting, Booth and the victim engaged in a "heated" argument.[3]

Trial counsel further testified that he had "since the very first day" talked with Booth about a guilty, or not guilty plea, and the respective consequences. However, when asked if he had advised Booth that his decision to plead guilty to murder would operate to deprive him of any jury verdict finding him guilty of a lesser included offense, including voluntary manslaughter, trial counsel answered, "I don't recall a discussion about that." Trial counsel stated that the State at one time offered to negotiate a plea bargain, i.e., that if Booth pleaded guilty, the State would recommend forty years' confinement. Trial counsel further testified that he discussed the proposed plea bargain with Booth and informed him that he thought a jury would assess punishment at "less than forty if they believed his story." When Bailey asked trial counsel, "And what story was that?," trial counsel replied:

A That he was so outraged that the shooting was sudden, not premeditated, as a result of his mind being in a slight rage by what his dad [sic] was saying about his family, his mother that he couldn't control himself and then he wasn't sure of what he was doing, I assume at the time.

Later in his testimony, trial counsel, on his own, volunteered the following:

I would like to add one thing in regard to the plea of guilty. I am not sure Donnie understood he was pleading guilty to knowingly shooting his grandfather. He was pleading guilty to intentionally doing it at the time and some of this come [sic]

out after the trial. Donnie told me, well, I didn't know I was doing it. At the time, when I discussed it, and decided he would plead guilty, our conversation was that he knew he was intending to shoot him when he shot him but he wasn't sure he knew what he was doing. And when he plead [sic] guilty, I don't think he knew he was pleading guilty of knowing what he was doing, but then I think his feeling was he was so outraged that he acted on impulse and really wasn't sure what he was going to do, then we would know what he was going to do, pleading guilty, I don't think he realized he was pleading guilty of knowing he was killing his grandfather.

Booth testified in part as follows:

Q If I didn't previously ask you, did [trial counsel] ever tell you that under the influence of sudden passion in a commission of a murder from adequate cause is a defensive [4] [sic] in nature and by its nature in the system serves to reduce the murder to manslaughter?

A. No, sir, he never told me that. I found out that after I got to prison and read it in the law book.

In summary, the record conclusively shows that trial counsel did not explain to Booth how the facts of his case related to the law of murder and voluntary manslaughter.[5] It may be fairly stated from a review of this record that trial counsel, as a matter of trial strategy, chose to present Booth's testimony of the heated argument between Booth and his grandfather occurring just before the shooting, on a plea of guilty to a jury, hopeful that such strategy[6] would produce a lenient verdict, rather

---

3. When asked by new counsel if he had reviewed the event with Booth, trial counsel responded:

A Oh, yes. And at his request I brought his family and some other people to testify about his grandfather's conduct and actions and prior activities to show that he had a good reason, a good basis for being mad and outraged and that was his, that was his story. He was so outraged and mad that he did this thing on an impulse without even thinking.

4. Bailey was apparently unfamiliar with *Bradley v. State*, 688 S.W.2d 847, 849 (Tex.Cr.App.1985) at the time of the hearing.

5. Section 19.04(a), (b), (c), (d).

6. That strategem was articulated by trial counsel to the trial judge in open court on February 26, 1986, as follows:

Your Honor, the Court indicated that I would probably be appointed to represent the defendant for his appeal, and the defendant feels like he ought to be entitled to file a Motion for New Trial in this case, and complains of some of the recommendations and advice which I gave him as his attorney, and there may have been some misunderstanding that has arisen. I had recommended that I

than pleading Booth not guilty to the jury and attempting by use of the same testimony to secure a conviction for the lesser offense of voluntary manslaughter.

In this appeal Booth contends, inter alia, that the failure of trial counsel to inform him how the facts of his case, more particularly the heated argument between him and his grandfather immediately preceding the shooting, related to the law of murder and voluntary manslaughter, and the State's burden of proof thereon as explained in *Braudrick v. State*, 572 S.W.2d 709, 711 (Tex.Cr.App.1978), denied him reasonably effective assistance of counsel under the Sixth and Fourteenth Amendments. Hence, Booth argues that his guilty plea was not knowingly and voluntarily made because he was not afforded the opportunity to make an informed choice of the plea he would enter in the cause. We agree. Trial counsel's failure on the facts[7] in the case to so advise Booth was conduct that "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).[8] The issue whether Booth shot his grandfather under the influence of sudden passion could have been submitted to the jury on a plea of not guilty as it is, in this case, an "implied element" of murder. *Bradley v. State*, 688 S.W.2d at 851. When Booth pleaded guilty to murder he was stripped of his right to have the jury consider and determine the issue. The record does not establish whether trial

counsel was unaware of the rule enunciated in *Bradley* and *Braudrick*, but does conclusively establish that Booth was not advised of the rule by his counsel. In either event, the resulting harm is the same; Booth was not afforded an opportunity to make an informed choice as to the plea he should enter in the cause.[9] Here, Booth was not advised by counsel that if his plea was "not guilty," the State, in the guilt-innocence phase, would be required to disprove beyond a reasonable doubt that in killing his grandfather he was acting "under the immediate influence of sudden passion arising from an adequate cause" before he could be convicted of murder,[10] and that the jury would be so instructed by the court. *Braudrick*, 572 S.W.2d at 710. In *Ex parte Gallegos*, 511 S.W.2d 510, 511 (Tex.Cr.App.1974), the Court of Criminal Appeals applied the "reasonably effective assistance" standard[11] to the case before it. The *Gallegos* court held that Gallegos was denied his Sixth Amendment right to effective assistance of counsel because of the failure of his trial counsel to advise him of the relationship of the facts in his case to the Texas law of robbery, thereby rendering Gallegos' plea of guilty unknowing and involuntary. *Ex parte Gallegos*, 511 S.W.2d at 513; *see also Herring v. Estelle*, 491 F.2d 125, 128–129 (5th Cir.1974). Booth's second point of error is sustained. We need not address the first point. The

---

thought it would be advisable and would probably be to his best interest to plead guilty to the charge because as I explained I felt that the jury would find that he was guilty of murder and that he did intend to shoot and kill the old man after all the facts, as I understood the record, the file and the testimony would be presented, and therefore if he saved the State the expense and the money of having a trial on the matter and saved the State the burden of having to present that evidence that the jury would no doubt take that into consideration and he would get a lighter sentence.

7. Booth's testimony clearly raised a fact issue as to whether, when he shot his grandfather, he was acting "under the immediate influence of sudden passion arising from an adequate cause." *Braudrick*, 572 S.W.2d at 710.

8. The standard was also stated by the court in *Strickland v. Washington* to be, "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms."

9. Satisfying the second component of the test employed in judging attorney performance enunciated in *Strickland v. Washington*, 104 S.Ct. 2064.

10. In this case, since Booth's testimony clearly raises "sudden passion," the absence thereof was an "implied element" of murder, and voluntary manslaughter was a lesser included offense. *See Bradley*, 688 S.W.2d at 849; *Braudrick*, 572 S.W.2d at 711.

11. Approved by the United States Supreme Court in *Strickland v. Washington, supra*, 104 S.Ct. 2064.

judgment of the trial court is reversed and this cause remanded for a new trial.